# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

RAYMOND BARTOE,                          )
                                         )
        Plaintiff,                   )
                                         )
    v.                               )      No. 1:07CV165RWS
                                         )
MISSOURI BARGE LINE COMPANY              )
INC., d/b/a NORTHERN AMERICAN            )
BARGE LINE INC.,                         )
                                         )
and                                      )
                                         )
CAPE GIRARDEAU FLEETING, INC.            )
                                         )
        Defendants.                  )

## MEMORANDUM AND ORDER

Plaintiff Raymond Bartoe, a former deckhand who slipped on ice and fell while working on the harbor tug M/V Coal Express, filed this lawsuit asserting claims for the usual admiralty trinity: the Jones Act for negligence, general maritime law for unseaworthiness, and maintenance and cure, all for the injuries he claims to have sustained while employed by Defendant Missouri Barge Line Inc. d/b/a North American Barge Line, Inc. and Defendant Cape Girardeau Fleeting, Inc. Bartoe claims Defendants were negligent and/or the Coal Express was unseaworthy for several reasons, including Defendants' failure to provide a safe place to work, proper equipment, adequate deicing chemicals, sufficient

personnel to prevent water from collecting and freezing on the deck, and for permitting its pilot to travel at a speed that facilitated the formation of ice on the deck.

Bartoe and Defendants have each moved for partial summary judgment. Bartoe argues he is entitled to partial summary judgment as a matter of law on two of Defendants' affirmative defenses. Specifically, Bartoe argues that Defendants cannot assert the "primary duty" doctrine as a defense and that Defendants are barred from claiming limitation of liability because they failed to post the required bond. Defendants argue that they are entitled to partial judgment as a matter of law because the mere presence of ice on a vessel does not render it unseaworthy or create a condition requiring the owner to take corrective measures, and Bartoe cannot establish that the lack of additional deck crew caused his injuries.

For the reasons stated below, I will grant in part and deny in part both Bartoe's and Defendants' motions for partial summary judgment.

## *Background*

Raymond Bartoe worked as a deckhand aboard the harbor tug M/V Coal Express in January 2007. Bartoe claims he injured his back when he slipped on ice on the tug's deck, fell from the tug and onto a barge in tow, and landed on a stationary tool. Bartoe has sued Defendants for negligence under the Jones Act,

46 U.S.C. § 30104, for unseaworthiness under general maritime law, and for

maintenance and cure. In Bartoe's Complaint, he asserts numerous theories of

liability. The theories that concern Defendants' motion are that ice on the deck

and a lack of adequate personnel rendered the vessel unseaworthy and that

Defendants were negligent by permitting or facilitating ice to accumulate on the

deck through a variety of acts or omissions, including operating the vessel too

quickly and providing insufficient personnel to clear the deck of ice.

January 16, 2007, was a cold day. The temperature hovered around 20

degrees Fahrenheit and there was a light breeze. Bartoe worked aboard the Coal

Express as a deckhand. Although it was not raining, snowing or sleeting, when

Bartoe boarded the Coal Express to begin his shift, ice had already formed on the

deck. That evening, the entire crew aboard the Coal Express consisted only of

Bartoe and its pilot, Dave Gerardi. It was not uncommon to operate the tug with

only one deckhand and one pilot, however. Bartoe testified that there had been an

additional crew member only about half of the roughly twelve occasions he had

worked aboard the Coal Express.

When Bartoe arrived to begin his shift, the deckhand working the shift

before him was salting the deck as part of his job duties. One of a deckhand's

many duties aboard a tow is to remove ice. Ice can form on the deck for various

reasons.  Defendants' corporate designee, Mike Griffith, testified that ice can

accumulate on the deck of a vessel if precipitation falls on the deck and freezes or

waves or the wake[1] of another vessel sprays water onto the deck and then freezes.

Gerardi, testified that the amount of ice that accumulates on the deck is directly

related to the speed the vessel travels.  David Carroll, a deckhand who was not

aboard the Coal Express that night, testified that the faster a vessel travels, the

more water collects on the deck.  Bartoe testified that, as the night wore on, spray

from the Mississippi river caused by the boat's movements, rather than by

precipitation, caused ice to accumulate on its deck.   Bartoe testified that mist

would accumulate on the deck regardless of the vessel's speed, but if the pilot had

run the boat at a slower rate, less ice would have accumulated.  He explained that

every time the pilot moved the boat, it was necessary to salt the deck because the

water coming up onto the deck would wash off.  Griffith stated that if the pilot

believes that water is coming up over the deck and freezing, he should slow down.

Throughout the evening, Bartoe continued to apply "ice melt" to the deck of

the Coal Express.  Bartoe had seen "frost and ice, real light ice" on a vessel's deck

before, but not the amount he saw on the Coal Express that night.  Bartoe claims

---

[1] Mike Griffith did not use the term "wake" in his deposition, but he did say, "Now there is a very good likelihood that another boat went by.  They always wash water over your decks when a boat passes." Dep. Mike Griffith, p. 172:23–25.

that when the ice was approximately ½ inch thick on the deck, he warned Gerardi about ice accumulation and told him they "had to slow up." Gerardi denies this and says that Bartoe never informed him that excessive water was splashing up on the deck and freezing or discussed with him the need to slow down.

Later that night or in the early morning hours of January 17, Bartoe and the pilot of the Coal Express were attempting to turn a barge loose from a fleet of barges operated by Cape Fleeting. In order to accomplish this task, it was necessary to "face up" the Coal Express to the barge (attach with wires from winches to deck fittings). While facing up, Bartoe used ice melt to improve his footing. Bartoe explained that salting the deck was necessary because otherwise, facing up would be impossible: "You had to get something under your feet or you would go in the river." Bartoe also testified that the product only melted ice, but did not assist in helping him to get his footing. Additionally, he testified, he used a sledge hammer to remove as much ice as he could. After Bartoe reapplied ice melt, the Coal Express remained stationary until after Bartoe's fall and the tug was moored. Bartoe testified that when he slipped, the ice was between 1/8 to 1/4 inch thick in the area where he lost his footing.

Bartoe and others testified about the hazards of ice on the deck and the steps Defendants could have or should have taken. Defendants have taken

precautionary steps in the past to avoid slip-and-fall accidents. For example, according to Kevin Hendershott, a Coal Express pilot who was not operating the vessel when Bartoe slipped, the deck of the Coal Express is painted each year with a "non-skid sand paint." But, according to Bartoe's expert, David Cole, once ice blankets the deck to the point where the deckhand's shoes do not contact skid resistant material on the deck, the nonskid coatings are ineffective. Griffith acknowledged that ice on the deck could be a safety hazard if the deckhand did not remove it.

Bartoe suggested that less ice would have accumulated if the pilot had run the boat at a slower rate. Carroll testified that during cold weather, the pilot usually operates the boat at a slower speed and does what he can to prevent water from splashing onto the deck. Hendershott testified that he operates the Coal Express at a slower speed than normal during cold weather to prevent ice from building up.

There is a factual dispute concerning whether Defendants should have provided an additional deckhand the night Bartoe fell. Bartoe suggested that Defendants could have provided additional help that night to salt the deck and remove ice as it accumulated and additional help would also mean the pilot would be in less of a hurry. Cole agreed and testified that he believed two deck hands

were necessary as a general matter of safety, and that a second deck hand was necessary to provide continual removal of ice. But Griffith testified that the weather conditions would not make it desirable or better to have an additional deckhand. Griffith did testify, however, that Defendants had an additional person aboard the Coal Express on 17 out of the 31 days in January. Carroll testified that he preferred to work alone and would rather not have an additional deckhand aboard. But moments later, Carroll testified that he would rather have a second deckhand aboard during bad weather.

### *Legal Standard*

In considering whether to grant summary judgment, a district court examines the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998). When a genuine issue of material fact exists, summary judgment should not be granted.

The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the

affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the nonmoving party has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

## *Discussion*

I.     Plaintiff's motion for partial summary judgment

Bartoe argues he is entitled to partial summary judgment as a matter of law on two of Defendants' affirmative defenses. First, Bartoe argues that Defendants cannot assert the "primary duty" doctrine as a defense because it is inconsistent with the Jones Act's comparative fault regime. Defendants counter that the primary duty defense is a well-established affirmative defense and is applicable to the facts of this case. Bartoe's second basis for partial summary judgment is that Defendants cannot claim the limitation of liability defense under 46 U.S.C. § 30505 because they have failed to post the required bond and provide evidence of

the Coal Express's value. Defendants respond that the requirement that a party place a bond applies only in a limitation of liability action, not when limitation of liability is raised as an affirmative defense.

A.      Primary Duty Doctrine

The primary duty rule states that "a seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment." Bernard v. Maersk Lines, Ltd., 22 F.3d 903, 905 (9th Cir. 1994). The parties agree that the Eighth Circuit has never addressed whether the primary duty rule prevents recovery under the Jones Act. Predictably, Defendants argue that I should follow the circuits that allow the affirmative defense and Bartoe argues that I should follow the circuits that consider the doctrine inconsistent with the Jones Act's adoption of comparative fault.

The Jones Act provides that a "seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws or the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section." 46 U.S.C. § 30104. Under the Federal Employers' Liability Act, which applies to actions for personal injuries to, or the wrongful death of, a railway employee, "the fact that the employee may have been guilty of contributory negligence shall not

bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee . . . ." 45 U.S.C. §§ 51, 53.

In <u>Pope & Talbot, Inc. v. Hawn</u>, 346 U.S. 406, 408–409 (1953), the United States Supreme Court explained,

> [t]he harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice. Exercising its traditional discretion, admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires.

The Court found no persuasive arguments to "adopt a discredited doctrine which automatically destroys all claims of injured persons who have contributed to their injuries in any degree, however slight." <u>Id.</u> at 409.

Despite the Supreme Court's rejection of contributory negligence as a bar to recovery in Jones Act cases, some courts have adopted a primary duty doctrine. The primary duty doctrine originated in Judge Learned Hand's opinion in <u>Walker v. Lykes Bros. S.S. Co.</u>, 193 F.2d 772 (2d Cir. 1952). Petition for Writ of Certiorari, <u>Mulcahy v. Washington</u>, (No. 01-1493), <u>cert. denied</u>, 536 U.S. 905 (2002) (discussing origin of doctrine). In <u>Walker</u>, Judge Hand differentiated

between two types of contributory negligence, one "results in no more than reducing the amount of an employee's recovery, [and the other] is a bar to any recovery." 193 F.2d at 773. The first type of contributory negligence occurs when the injured person breaches a duty "which the law imposes upon the injured, regardless of any conscious assumption of a duty toward the wrongdoer." Id. The second type of contributory negligence occurs when the injured person breaches "a duty which the injured person has consciously assumed as a term of his employment." Id. Judge Hand concluded that where the master of the ship failed to make certain repairs, "his failure was not only 'contributory negligence' in the first sense, but also a breach of his duty to the defendant which barred his recovery absolutely." Id. at 774.

This doctrine has been met with great resistence, even from another Second Circuit panel. Schlichter v. Port Arthur Towing Co., 288 F.2d 801, 805 n.3 (5th Cir. 1961) (discussing criticism of primary duty rule). For example, in Dunbar v. Du Bois' Sons Co., 275 F.2d 304, 306 (2d Cir. 1960), Judge Waterman wrote, "Judge Clark and I believe that the Walker doctrine is incompatible with the congressional mandate that contributory negligence and assumption of risk shall not bar a recover in a Jones Act case."

Since <u>Walker</u>, several Courts of Appeals have discussed the primary duty doctrine and its applicability to the Jones Act. In <u>Boat Dagny, Inc. v. Todd</u>, 224 F.2d 208, 211 (1st Cir. 1955), the First Circuit rejected the primary duty doctrine as inconsistent with the Jones Act's repudiation of assumption of the risk, stating,

> [w]e cannot find in the Act any suggestion that the Congress had in mind this refinement between the two species of contributory fault. It is significant that Judge Hand felt himself to be bound by cases which were decided before the 1939 amendment to the Federal Employer's Liability Act, which plugged up what Congress deemed to be a leak in he original Act, by abolishing specifically the defense of assumption of risk.

Assumption of the risk in this context was the product of "the application of the 'primary duty rule' in which contributory negligence through a violation of a company rule became assumption of the risk." <u>Tiller v. Atlantic Coast Line R. Co.</u>, 318 U.S. 54, 63 (1943). "Following the enactment of the 1939 amendment, the Supreme Court held that every vestige of the doctrine of assumption of risk was obliterated from the law and that the 'primary duty rule' . . . had been swept into discard." <u>Boat Dagny, Inc.</u>, 224 F.2d at 212.

Following <u>Boat Dagny</u>, the First Circuit acknowledged that a seaman who has a duty to prevent or remedy a certain peril cannot choose not to remedy it and then make a claim against a ship. <u>Peymann v. Perini Corp.</u>, 507 F.2d 1318,

1322–23 (1st Cir. 1974).  Accordingly, the primary duty defense is available

where the seaman's "breach of duty constitutes the *sole cause* of injury."  Id. at

1323 (emphasis added).  On the facts of the case before it, the court noted that

after the plaintiff encountered spilled oil, which he had the primary duty to clean,

he elected not to clean it and instead stepped in the oil.  Id. at 1322.  He then

sought to hold the ship liable even *if the fault were solely his*.  Id.  In a subsequent

case, the court explained,

> [t]he primary duty rule provides that a ship's officer may
> not recover against his employer for negligence or
> unseaworthiness when there is no other cause of the
> officer's injuries injuries other than the officer's breach of
> his consciously assumed duty to maintain safe conditions
> aboard the vessel. . . The primary duty rule bars recovery
> only if there was no cause of the officer's injuries other
> than the breach of duty.

Wilson v. Maritime Overseas Corp., 150 F.3d 1, 11 (1st Cir. 1998).  The defense is

only available in the First Circuit when (1) the injured seaman owed a duty to the

defendants, (2) he breached that duty, and (3) that breach was the sole cause of his

injury.  Id.  The defense is not available where "the plaintiff breached his duty but

the ship's owner was also independently at fault."  Id.  The bar to recovery is "not

based on the contributory negligence of the officer, but on a finding of no

negligence of the employer."  Id.

The Ninth Circuit considered the First Circuit's conclusion in Boat Dagny that Judge Hand was unaware of the Tiller decision and amendments to the Federal Employers' Liability Act naive. Instead, it was more persuaded by Judge Harlan's analysis that the primary duty defense turns "not upon any question of 'proximate cause,' 'assumption of risk' or 'contributory negligence,' but rather upon the employer's independent right to recover against the employee for the nonperformance of a duty resulting in damage to the employer, which in effect offsets the employee's right to recover against the employer for failure to provide a safe place to work." Reinhart v. United States, 457 F.2d 151, 154 (9th Cir. 1972) (quoting Dixon v. United States, 219 F.2d 10, 16–17 (2d Cir. 1955)).

The Fifth Circuit has rejected the primary duty rule as obsolete. Louisiana & Arkansas Ry. Co. v. Johnson, 214 F.2d 290, 292 (5th Cir. 1954) (discussing abolition of the primary duty defense under the Federal Employer's Liability Act). The Seventh Circuit also concludes that the doctrine is inconsistent with the Jones Act. Kelley v. Sun Trans. Co., 900 F.2d 1027, 1031–32 (7th Cir. 1990) ("Our rejection of a rule barring recovery by a ship's officer comports with the statute's rejection of a harsh application of contributory negligence."). The Seventh Circuit reasoned that if the officer's negligence was the sole cause of his injuries, he

would not be able to recover damages because "the employer's non-negligence bars recovery." Id. at 1031.

Several circuits have not rejected the primary duty doctrine in theory, but have found it inapplicable on the facts of the case. The Fourth Circuit has only considered the application of the primary duty doctrine once. In Mason v. Lynch Bros. Co., 228 F.2d 709, 711–12 (4th Cir. 1956), the court determined it was not necessary to choose between the reasoning of the First and Second Courts of Appeals in Boat Dagny, Inc. and Walker because the plaintiff should be treated as a seaman, not the master of the vessel. As a seaman, the plaintiff's conduct would not bar recovery, "but as contributory negligence, would go only in reduction of the amount of his recovery." Id. at 712. Thus, the defense is not available in the Fourth Circuit unless the plaintiff was the master of the vessel.

The Eleventh Circuit has refused to apply the primary duty in cases where no misconduct or actual knowledge of an unsafe condition existed, even in the case of the vessel's captain. Villers Seafood Co., Inc. v. Vest, 813 F.2d 339, 342–43 (11th Cir. 1987). The Court of Appeals concluded that even if the captain was aware of the unsafe condition, "it would not bar recovery in [the] action. Assumption of the risk and contributory negligence are not defenses to a claim of unseaworthiness but may only be proven in mitigation of damages." Id. at 342.

Absent misconduct, the vessel "owner's right to have his condition of employment and instructions obeyed is adequately vindicated . . . by application of mitigation of damages according to the doctrine of comparative negligence." Id. at 343.[2] Similarly, in the Sixth Circuit, "[t]he rule only applies to a knowing violation of a duty consciously assumed as a term of employment." Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 910 (6th Cir. 2009).

As noted above, the Eighth Circuit as never addressed the primary duty defense in a Jones Act or FELA case. Defendants ask me to introduce the doctrine to the law of this circuit. I would be reluctant to do so in general in light of the Second Circuit's own resistence to the primary duty doctrine, the history of the doctrine, the fact that Judge Hand's opinion predates the Supreme Court's decision in Pope & Talbot, Inc. (which specifically rejects the bar of contributory negligence in a Jones Act case), and the decisions of the Courts of Appeals finding it inconsistent with the Jones Act. I believe the doctrine is inconsistent with the

---

[2] Although the Eleventh Circuit stated that it was unwilling to extend the doctrine to cases where there was no finding of (1) misconduct or (2) actual knowledge of the unsafe condition, I believe the only remaining possible application of the primary duty doctrine the Eleventh Circuit is in cases of affirmative misconduct because the court stated that even if the ship's captain was aware of an unsafe condition, that would not bar recovery, but only serve to mitigate the damages. Viller's Seafood Co., Inc., 814 F.2d at 342 ("Even if the court did make such a finding, and even if that finding was supported by evidence, it would not bar recovery in this action. Assumption of the risk and contributory negligence are not defenses to a claim for unseaworthiness but may only be proven in mitigation of damages.").

Jones Act's rejection of contributory negligence and assumption of the risk as bars to recovery. I need not make a general rejection of the doctrine, however, because in the circumstances of this case, the doctrine is also inapplicable under the narrow approach of Fourth and Eleventh Circuits. I recognize that under the law of the Ninth Circuit, Defendants could raise the defense. I believe the Ninth Circuit's interpretation is inconsistent with the Jones Act.

The primary duty defense is not available in this case. First, Bartoe was not the master of the vessel. Additionally, although Bartoe had a duty to remove ice from the deck from the Coal Express, there is no evidence that the reason Bartoe slipped on the ice was misconduct or his intentional and knowing decision to ignore that duty. The parties agree that ice formed on the deck of the Coal Express as a result of water splashing on the deck. The tow's pilot, Gerardi, testified that he did not see Bartoe act in an unsafe way. Defendants have presented no evidence that Bartoe decided to ignore his duties. In fact, Defendants charge that Gerardi "is in no position to testify regarding whether plaintiff was discharging his duties at that time." This is not a case where the seaman elected or chose to ignore a duty to make the ship safe. As a result, I will grant Bartoe's motion for partial summary judgment on the issue of Defendants' affirmative defense under the primary duty doctrine.

B. Limitation of Liability

Bartoe also argues that Defendants cannot assert limitation of liability as an affirmative defense because they have failed to post a bond with the Court. Defendants respond that the bond requirements apply only to actions for limitation of liability and do not apply when limitation is raised as an affirmative defense. They acknowledge that if they had initiated a limitation fo liability pursuant to 46 U.S.C. § 30511, they would be required to follow the procedural requirements of Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, including the creation of a limitation fund.

"It has long been recognized that limitation of liability may be invoked by a shipowner either as a defense in an action seeking damages or by an independent petition in admiralty." <u>Cincinnati Gas & Elec. Co. v. Abel</u>, 533 F.2d 1001, 1003 (6th Cir. 1976). The Limitation of Liability Act statute explains the two methods for claiming limitation of liability in an admiralty matter. First, the shipowner may claim limitation of liability as a defense under 46 U.S.C. § 30505 (formerly codified as 46 U.S.C. § 183). Section 30505, General limit of liability, provides:

> (a) In general.--Except as provided in section 30506 of this title, the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight. If the vessel has more than one owner, the proportionate share of

the liability of any one owner shall not exceed that owner's proportionate interest in the vessel and pending freight.

(b) Claims subject to limitation.--Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner.

(c) Wages.--Subsection (a) does not apply to a claim for wages.

This section, which authorizes the limitation of liability defense, contains no express time limitation.  The Chickie, 141 F.2d 80, 85 (2d Cir. 1944).

The second method a shipowner may claim limitation of liability is by bringing an action for limitation of liability under 46 U.S.C. § 30511 (formerly codified at 46 U.S.C. § 185).  Section 30511,  Action by owner for limitation, provides:

(a) In general.--The owner of a vessel may bring a civil action in a district court of the United States for limitation of liability under this chapter. The action must be brought within 6 months after a claimant gives the owner written notice of a claim.

(b) Creation of fund.--When the action is brought, the owner (at the owner's option) shall–

(1) deposit with the court, for the benefit of claimants--

(A) an amount equal to the value of the owner's interest in the vessel and pending freight, or approved security; and

(B) an amount, or approved security, that the court may fix from time to time as necessary to carry out this chapter; or

(2) transfer to a trustee appointed by the court, for the benefit of claimants--

(A) the owner's interest in the vessel and pending freight; and

(B) an amount, or approved security, that the court may fix from time to time as necessary to carry out this chapter.

(c) Cessation of other actions.--When an action has been brought under this section and the owner has complied with subsection (b), all claims and proceedings against the owner related to the matter in question shall cease.

This section, which permits the shipowner to bring the action, contains an express requirement that the shipowner commence the action within six months and provide security or post a bond.

Bartoe claims that the Eighth Circuit Court of Appeals has "clearly held" that a defendant must deposit with the Court an amount equal to the value of its interest in the vessel and its freight or give security for that amount in order to

assert a limitation of liability defense.  He cites <u>New York Marine Managers, Inc.</u>

<u>v. Helena Marine Service</u>, 758 F.2d 313 (8th Cir. 1985) and <u>Mo Barge Lines, Inc.</u>

<u>v. Belterra Resort Indiana, LLC</u>, 360 F.3d 885 (8th Cir. 2004) in support.  But in

neither of these cases did the Eighth Circuit clearly hold that the shipowner must

post a bond or security when raising the limitation of liability defense under 46

U.S.C. § 30505 (formerly § 183).

In <u>New York Marine Managers</u>, the Eighth Circuit addressed the procedural

requirements for asserting a limitation of liability petition. 758 F.2d at 314,

316–17.  The court discussed the § 185 and Rule F of the Supplemental Rules for

Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure

requirements for barge owners who petitioned for limitation of liability. <u>Id.</u>  There,

the shipowners brought a limitation action pursuant to § 185 (now §30511) and

did not assert limitation as an affirmative defense.  <u>Id.</u>

As in this case, in <u>Mo Barge Lines</u>, the defendant vessel owners asserted

limitation of liability as a defense.  360 F.3d at 888–89.  In its discussion of

limitation of liability, the Eighth Circuit stated, "[a]n owner seeking to invoke the

Act must petition the district court for a limitation of liability and must deposit

with the court an amount equal to the value of his interest in the vessel and its

freight or give security for such value." <u>Id.</u> at 890.  Bartoe believes that this

sentence imposes the procedural requirements of Rule F on defendants who claim limitation of liability as an affirmative defense.

But this language does not demand that Defendants, when asserting limitation of liability as an affirmative defense, post a bond or give security. First, the language upon which Bartoe relies is dicta. The Eighth Circuit engaged in no analysis regarding whether Defendants had failed to comply with any procedural requirements regarding a bond or security. The limitation analysis in Mo Barge Lines turned on whether the defendant had privity and knowledge that its pilot would operate its vessel negligently. There was no discussion regarding compliance, or the necessity to comply, with Rule F when pleading limitation as an affirmative defense. Second, the Eighth Circuit's one sentence mention of the bond or security requirements of Rule F itself states "[a]n owner seeking to invoke the Act *must petition the district court . . . .*" Id. The sentence clearly applies to the instances when a vessel owner petitions for limitation of liability. Third, when stating that rule of law, the Eighth Circuit cited Universal Towing Co. v. Barrale, 595 F.2d 414, 416–17 (8th Cir. 1979), a case where the vessel owner had filed a complaint under the Limitation of Liability Act.

Moreover, Bartoe's interpretation of the Eighth Circuit's dicta in Mo Barge Lines conflicts with the substantial body of authority concluding that the

procedural requirements of § 185 do not apply to the affirmative defense under §

183.  See, e.g., Deep Sea Tankers v. Long Branch, 258 F.2d 757, 773 (2d Cir.

1958) (neither time limit nor bond requirement of §185 apply to §183); The

Chickie, 141 F.2d at 85 (time limit of §185 does not apply to §183); Karim v.

Finch Shipping Co., Ltd., 265 F.3d 258, 263–64 (5th Cir. 2001) (time limit of

§185 does not apply to §183 and statute requires bond after filing §185 petition);

Sana v. Hawaiian Cruises Ltd., 181 F.3d 1041, 1047 (9th Cir. 1999) (time limit of

§ 185 does not apply to §183).

     A plain reading of the statute compels my conclusion that the procedural

requirements of § 30511 regarding time limitations and the posting of a bond

apply "[w]hen the action [by owner for limitation] is brought."  Section 30511

does not state that it also applies to the "general limit of liability" under §30505.

Because Defendants raise limitation of liability as an affirmative defense and did

not initiate a limitation of liability action, they are not required to post a bond or

security.  As a result, I will deny Bartoe's motion for partial summary judgment as

it relates to Defendant's affirmative defense of limitation of liability.

II.    Defendants' motion for partial summary judgment

     Defendants argue that they are entitled to partial judgment as a matter of law

because the mere presence of ice on a vessel does not render it unseaworthy or

create a condition requiring the owner to take corrective measures.  Defendants

also claim that Bartoe cannot establish that the lack of additional deck crew caused

his injuries.  Bartoe, of course, disputes these points.

Although both parties argue unseaworthiness and negligence together, the

United States Supreme Court has firmly stated "that the owner's duty to furnish a

seaworthy ship is absolute and completely independent of his duty under the Jones

Act to exercise reasonable care." <u>Mitchell v. Trawler Racer, Inc.</u>, 362 U.S. 539,

549 (1960).  "[U]nseaworthiness is a condition, and how that condition came into

being—whether by negligence or otherwise—is quite irrelevant to the owner's

liability for personal injuries resulting from it." <u>Usner v. Luckenbach Overseas</u>

<u>Corp.</u>, 400 U.S. 494, 498 (1971).  Therefore, I will analyze each cause of action

separately.

A.     Unseaworthiness

A vessel owner has an absolute duty to furnish a seaworthy vessel. <u>Trawler</u>

<u>Racer</u>, 362 U.S. at 547.  Although the duty is absolute, the owner is not obligated

to furnish an accident-free ship. <u>Id.</u> at 550.  Instead, the duty is "to furnish a

vessel and appurtenances reasonably fit for their intended use. <u>Id.</u> "Examples of

conditions that can render a vessel unseaworthy include defective gear,

appurtenances in disrepair, insufficient manpower, unfit crew, and improper

methods of loading or stowing cargo." Britton v. U.S.S. Great Lakes Fleet, Inc., 302 F.3d 812, 818 (8th Cir. 2002). A slippery rail can also render a ship unseaworthy. Trawler Racer, 362 U.S. at 540; Usner, 400 U.S. at 498–99. These conditions need not be permanent; an unseaworthy condition can be temporary. Trawler Racer, 362 U.S. at 549.

       1.     Ice

Bartoe claims the Coal Express was unseaworthy due to ice that accumulated while he was working on the vessel. Defendants argue that the mere accumulation of ice on the deck does not make a vessel unseaworthy because a seaman is not entitled to a deck that is not slippery. Bartoe agrees that he was not entitled to a deck that was not slippery, but argues that the thickness of the ice accumulation on the deck of the Coal Express made the deck unreasonably slippery.

The courts have consistently held that a seaman is not entitled to a deck that is not slippery, but he is entitled to a deck that is not unreasonably slippery. Colon v. Trinidad Corp., 188 F. Supp. 97, 100 (S.D.N.Y. 1960); Tate v. A/B Svenska Amerika Linein, 331 F. Supp. 854, 857 (E.D. La. 1970); Foster v. Maritrans, Inc., 790 A.2d 328, 332 (Pa. Super Ct. 2002). For this reason courts have concluded that ice on the deck of a vessel does not render it unseaworthy. But the caselaw

does not state that ice can never render a vessel unseaworthy. Ice on a deck may make a vessel unseaworthy in some limited circumstances. For example, the combination of ice on the deck and inadequate lighting where sufficient illumination could have revealed the slippery condition can cause a vessel to be unseaworthy. Pacific Far East Lines, Inc. v. Williams, 234 F.2d 378,379 (9th Cir. 1956). The cases finding unseaworthiness based on slippery railings or decks tend to involve vessels docked in port. See, e.g., Trawler Racer, 362 U.S. at 540 (crewmember injured after slipping on railing while docked); Pacific Far East Lines, Inc., 234 F.2d at 379 (longshoreman injured after slipping on icy hatch while docked). This is probably because a crewmember does not reasonably expect to encounter slippery conditions when the vessel is docked.

But on vessels on open water, the presence of water, snow and sleet on the deck should be reasonably expected and are "unavoidable incidents of shipboard life." 790 A.2d at 332. In Connorton v. Harbor Tow Corp., 237 F. Supp. 63, 65 (D. Md. 1964), the court noted that "[a]s a practical matter, it would be impossible to maintain an ice free deck while operating at sea in freezing weather where the slightest ocean spray can create sheets of ice on deck."

Bartoe was aboard a tow in the Mississippi River on a cold January evening. Although Bartoe fell while the vessel was moored, the ice formed while Bartoe

was on the river and not docked.  Because the presence of ice on the deck should be reasonably expected under these circumstances, it did not render the vessel unseaworthy.  Therefore,  I will grant Defendants' motion for partial summary judgment on the issue of unseaworthiness for excessive ice accumulation.

2.  Insufficient Deckhands

Bartoe also claims that the Coal Express was unseaworthy because it lacked sufficient deckhands and that the lack of sufficient crew members to clear the deck of ice caused him to slip upon ice that accumulated on the deck.  Defendants argue that Bartoe has failed to show the lack of deckhands caused his injuries and that Bartoe cannot escape summary judgment with pure speculation that he would not have been injured if the boat had been sufficiently staffed.

Insufficient manpower can render a vessel unseaworthy.  Britton, 302 F.3d at 818.  The plaintiff must show that the unseaworthiness was a proximate cause of the injury.  Id.  "Under these circumstances, proximate cause means: first, that the unseaworthiness . . . played a substantial part in bringing about or actually causing the injury; and [second], that the injury was either a direct result [of or] a reasonable probable consequence of the unseaworthiness."[3]  Id.

---

[3] Britton actually reads, "Under these circumstances, proximate cause means: first, that the unseaworthiness . . . played a substantial part in bringing about or actually causing the injury; and two, that the injury was either a direct result *of* a reasonable probable consequence of the

Defendants argue that Bartoe has not presented anything other than speculation that the lack of an additional deckhand was a cause of his injuries. In support of this argument, Defendants cite Kennedy v. Adamo, No. 1:02CV1776ENV-RML (E.D.N.Y. Sept. 1, 2006). In Kennedy, the court noted that "[t]estimony by an injured party as to what he would have done only if something else had or had not happened is nothing more than self-serving speculation." Id. at *3. Summary judgment is appropriate if the plaintiff's claims are based on "pure speculation." Id. In that case, the plaintiff, a seaman, was injured when the truck he was driving was rear-ended two to three seconds after stopping. Kennedy v. Adamo, No. 02CV1776ENV-RML, Report and Recommendation, at 2 (E.D.N.Y. Mar. 29, 2006). The plaintiff contended that the vehicle's lack of a rearview mirror caused the accident because, had the truck been properly equipped, he might have seen the car approaching in the rearview mirror during the two or three second period and would done "whatever [he] could have . . . to keep from getting hit." Id. at 5 The Magistrate recommended that summary judgment be granted because the link between the absent rearview mirror and the

_____

unseaworthiness." 302 F.3d at 818. The Eighth Circuit's Manual of Model Jury Instructions for the District Courts of the Eighth Circuit cites Britton to establish the standard for determining proximate cause. Model Civ. Jury Instr. 8th Cir. 8.35 (2009) ("The injury or damage must have been either a direct result *of or* a reasonably probable consequence of the cause and except for the cause the injury or damage would not have occurred.")

injury was too speculative.  Id. at 10.  To prevail, the plaintiff would need to show (1) he would have seen the oncoming car in the rearview mirror, (2) examine the roadway to determine a safe space to move the truck, and (3) react, accelerate, and move the truck out of the way of the oncoming vehicle, all in a matter of two to three seconds.  Id. at 10–11.  Additionally, the plaintiff would need to demonstrate that there was in fact a safe place to move the truck and that by moving the truck, he would have safely avoided the accident or lessened the impact.  Id. at 11.  The Magistrate noted that the plaintiff's theory of causation was based almost entirely on speculation.  Id.

That is not the case here.  Bartoe has provided evidence that could lead a reasonable jury to conclude his injuries were a "reasonably probable consequence" of the lack of deckhands on the Coal Express.  Unlike the plaintiff in Kennedy, Bartoe requires the jury to make only one inference, that the second deckhand would have removed the ice Bartoe slipped on.  Bartoe's expert testified that a second deckhand was necessary to provide continual removal of ice.  Similarly, Bartoe testified that an additional crew member would have helped prevent the accumulation of ice by helping him salt it down and remove it.  Bartoe also testified that an additional crew member would have caused Gerardi to be in less of a hurry, which in turn would have caused less water to spray on the deck.

While it is true that Bartoe's expert acknowledged that a second deckhand might have missed the ice Bartoe slipped on, a fact-finder could reasonably infer that the deckhand would not have missed that particular patch of ice. The expert testified that assuming,

> the second deckhand wasn't standing there smoking a cigarette for the whole period of time and no clearing the ice, I mean, we can say that. In which case the ice wouldn't have been cleared, but if there's a second deckhand doing what he supposed to do, I think it's not speculative to say that he could have removed the ice that Mr. Bartoe slipped on.

Dep. David Cole, 68:1–8.

Defendants also assert that an additional deckhand would not have prevented ice from forming. Bartoe acknowledged that in his deposition. However, Bartoe does not claim a second deckhand was needed to prevent ice from forming. He claims the second deckhand was necessary to remove ice that had already formed. Because a reasonable fact-finder could conclude that Bartoe's injury was a reasonably probable consequence of the lack of a second deckhand to remove ice, I will deny summary judgment as to unseaworthiness for lack of sufficient deckhands.

B.    Jones Act Negligence

"A Jones Act claim is an <u>in personam</u> action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members." <u>Britton</u>, 302 F.3d at 816.  As discussed above, the Jones Act provides that a "seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws or the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."  46 U.S.C. § 30104.  To prevail on a Jones Act claim, the plaintiff must show (1) that he is a seaman under the Act; (2) that he suffered an injury in the course of his employment; (3) that his employer was negligent; and (4) that his employer's negligence caused his injury, at least in part.  <u>Hernandez v. Trawler Miss Vertie Mae, Inc.</u>, 187 F.3d 432, 436 (4th Cir. 1999).

1.    Ice

In this case, Bartoe alleges that Defendants were negligent when the pilot of the Coal Express traveled between barges at a speed that allowed water to collect on the deck of the Coal Express which then formed ice.  Defendants argue that because ice accumulation is inevitable, regardless of the speed the vessel operates, they cannot have acted negligently by operating the vessel in a way that allowed or

encouraged ice accumulation.  Defendants further argue that because the vessel was moored at the time Bartoe slipped, the vessel's speed could not have contributed to Bartoe's injures.

The parties dispute both whether ice accumulation can be the basis of negligence and whether the pilot's actions caused excessive ice to accumulate in this case.  The courts in several cases have concluded that the presence of ice on a vessel does not create a condition requiring the owner to take corrective measures. See, e.g., Tate, 331 F. Supp. 854; Colon, 188 F. Supp. 97.  Bartoe, however, does not base his negligence claims on Defendants' failure to clear ice from the deck. Instead, Bartoe claims Defendants breached their duty of care to him when the pilot operated the vessel in a way that caused excessive ice to accumulate. He also argues they were negligent by failing to provide a safe place to work, adequate deicing chemicals and sufficient personnel.

A vessel owner's acts or omissions which lead to an injury caused by ice accumulation may support a finding of negligence.  For example, in Pacific Far East Lines, 234 F.2d at 379, a longshoreman slipped on frost that accumulated aboard a vessel.  The Ninth Circuit concluded that the vessel owner's failure to turn on lights that were supposed to be on at all times and would probably have case sufficient illumination on an area to reveal a slippery condition could

constitute negligence.  Id.  Likewise, in <u>Mercado v. United States</u>, 184 F.2d 24,

29–30 (2d Cir. 1950), the Second Circuit concluded that a vessel owner could be

negligent for its omissions which led a seaman to slip on snow and ice that had

accumulated on the gangway.  In <u>Mercado</u>, the seaman slipped around 8 p.m.  Id.

at 29.  The owner had made no effort to sand the gangway or clear off the snow

since the early morning hours.  Id. at 30.

Defendants argue that because ice accumulation is inevitable, Bartoe cannot

show Defendants breached their duty of care to him.  There is no doubt that some

ice would accumulate on the deck.  The pilot of the Coal Express acknowledged

that, "it's icy out so it's an assumption that there's ice on the deck."  Dep. Dave

Gerardi, p.35:12–13.  Defendants did not have a duty to prevent all ice from

accumulating on the deck.

Whether Defendants were negligent, however, turns on whether Gerardi

acted in a way that caused *too much* ice to accumulate on the deck.  Bartoe alleges

that Defendants were negligent when Gerardi traveled between barges at a speed

that allowed more water than appropriate under the circumstances to collect on the

deck of the Coal Express, which then turned to ice.  The parties dispute whether

Gerardi knew he piloted the vessel in a way that caused excessive ice formation.

Bartoe testified that about two hours before he slipped, he informed the pilot of the

-33-

Coal Express that the ice on the deck was getting too thick and they needed to "slow up." Gerardi testified that Bartoe did not tell him it was necessary to slow down the vessel because water was splashing up on the deck and freezing.

Defendants also argue because the Coal Express was moored at the time Bartoe slipped, Gerardi's speed could not have caused the accident. Defendants assert that the period between the moment the vessel stopped moving and the time Bartoe slipped was "at least long enough for the plaintiff to remove any accumulated ice and then move around the deck without slipping while facing the coat up." Whether Bartoe had enough time to remove the accumulated ice from the deck is a question of fact for the jury.

Because there are genuine issues as to whether Gerardi operated the Coal Express in a way that caused excessive ice accumulation and whether Bartoe had sufficient time to remove it before slipping, I will deny Defendants' motion for partial summary judgment on Bartoe's Jones Act claims for negligence relating to ice accumulation.

2.      Insufficient deckhands

Bartoe also alleges Defendants were negligent when they failed to provide adequate deckhand employees aboard the Coal Express. Defendants argue that Bartoe has not presented evidence to prove that the absence of a second deckhand

caused him to slip and fall. Defendants also argue that harbor tugs, such as the Coal Express are routinely operated with only one deckhand.

Under the Jones Act, the "basis of liability rests on a showing of negligence, not the fact that an injury occurred." Britton, 302 F.3d at 817. Defendants argue that Bartoe admits an additional deckhand would not have helped. A close look at Bartoe's deposition reveals that Bartoe believed an additional deckhand would helped prevent ice accumulation. Bartoe admits that the presence of an additional deckhand would not prevent ice *formation* on the deck of the Coal Express, but Bartoe asserts that an additional deckhand would have prevented ice *accumulation* "by helping [him] salt it down and take it off." Dep. Raymond Bartoe, 80:3–5. Bartoe's expert testified, "It's my belief that the way the ice was accumulating that night, based on everything that I read, you would need a second deckhand who could provide continual removal of ice." Dep. Cole, 49:17–20. As discussed above, Cole acknowledges that the deckhand could have missed the patch of ice Bartoe slipped on, but states that if there was a second deckhand doing what he was supposed to do, and not "standing there smoking a cigarette for the whole period of time and not clearing the ice, it is not speculative to say that he could have removed the ice that Bartoe slipped on." Dep. Cole, 67:10–68:10.

Defendants' procedure manual states that the appropriate number of people needed to be based on several conditions, including environmental and weather conditions. Bartoe's expert testified that based on the way ice was accumulating, a second deckhand was necessary. Cole's testimony alone presents a question of material fact regarding whether a second deckhand was necessary due on the Coal Express that evening. Bartoe's testimony also presents a fact question regarding whether the ice upon which Bartoe slipped would have accumulated had Defendants provided a second deckhand. As a result, I will deny Defendants' motion for partial summary judgment on Bartoe's Jones Act claims.

Accordingly,

**IT IS HEREBY ORDERED** Bartoe's motion for partial summary judgment [#61] is **GRANTED in part and DENIED in part**. Bartoe's motion for partial summary judgment is granted as to the Defendants' affirmative defense under the primary duty doctrine. Bartoe's motion for partial summary judgment is denied as to Defendants' affirmative defense of limitation of liability.

**IT IS FURTHER ORDERED** that Defendants motion for partial summary judgment [#48] is **GRANTED in part and DENIED in part**. Defendants' motion for partial summary judgment is granted as to Bartoe's claims that ice on the deck rendered it unseaworthy. Defendants' motion for partial summary

judgment is denied as to Bartoe's Jones Act claims for negligence relating to ice formation on the deck. Defendants' motion for partial summary judgment is denied as to Bartoe's claims that insufficient deckhands rendered the vessel unseaworthy. Defendants' motion for partial summary judgment is denied as to Bartoe's Jones Act claims for negligence for failing to provide sufficient deckhands.

Dated this 7th day of July, 2009.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE